UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

JOHN W. WOFFORD )
 )
V. ) NO. 2:07-CV-107
 )
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The plaintiff has filed an action for review of the administrative decision of the Commissioner denying his application for disability insurance benefits. The matter has been referred to the United States Magistrate Judge [Doc. 15] for a report and recommendation with respect to the plaintiff's Motion for Judgment on the Pleadings [Doc. 11], and the Commissioner's Motion for Summary Judgment [Doc. 15].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988).

At the outset of this report and recommendation, the Court notes that the administrative proceedings at issue occurred in the State of Florida, and the plaintiff was represented at all stages of those proceedings by Florida attorneys. It was after the plaintiff moved to Newport, Tennessee that he retained his present attorneys who filed his dispositive motion in this Court.

Plaintiff was 50 years of age at the time of the hearing before the Administrative Law Judge. He had past relevant work experience as a newspaper advertising sales editor, newspaper mail sorter, newspaper proof reader, and newspaper editor. He seeks disability due to neck pain with muscle spasms and accompanying headaches and a mental impairment. He alleges a disability onset date of January 31, 2003. Plaintiff has a high school education with two years of college, and it is obvious from his handwritten statements and his testimony that he is quite intelligent and knowledgeable.

Plaintiff was originally injured when the bicycle he was riding was struck by the mirror of a car in 1991. His present difficulties, which he alleges exacerbated his previous injury, come from an automobile accident in 2001 when his vehicle was struck in the rear, causing a whiplash type of injury to the plaintiff. [Tr. 147].

Plaintiff's primary treating physician for his neck injury is Dr. William A. Holt, a neurologist in Port Charlotte, Florida. Dr. Holt first saw the plaintiff on September 24, 2002. He noted that the plaintiff was experiencing on an almost daily basis "tightness in the back of his head and neck that can radiate to the frontal lobes" accompanied by nausea. The pain was "not necessarily worse with exertion or bending over." Dr. Holt noted that the plaintiff

suffered from muscle spasms in his neck, and that he had been under treatment at a pain center with physical therapy. The headaches had been treated with a C2 block with Celestone and Marcaine, which provided relief for about two weeks. He also had chronic problems with insomnia. The physical examination revealed "normal muscle tone, bulk and power" without noticeable atrophy. The diagnosis was chronic cervicogenic headaches and neck pain with chronic paravertibral muscle spasms. Dr. Holt elected to try a Botox injection. [Tr. 215-17].

He saw Dr. Holt again on November 1, 2002. Dr. Holt noted that plaintiff was taking Neurontin and Hydrodocodone for pain relief. Botox was again Dr. Holt's treatment of choice, but insurance approval was not forthcoming. Plaintiff's condition remained unchanged. [Tr. 213-14]. Plaintiff was also seen on December 13, 2002. He stated that he had a gradual improvement over the last few months from taking Neurontin and Hydrocodone. His insomnia had "significant improvement" from taking 25 mg of Elavil. The physical exam showed an actual muscle spasm on the left trapezius muscle. Once again, Dr. Holt recommended the Botox injections. [Tr. 211-12].

On February 11, 2003, plaintiff received 200 units of Botox. [Tr. 209]. He returned to see Dr. Holt next on March 18, 2003. Dr. Holt noted that after receiving the Botox injections, plaintiff's symptoms worsened for several days, but then "spontaneously improved to the point where now for the first time in several months he has no significant headaches." The impression was severe refractory headaches secondary to cervical muscle spasm successfully treated with Botox. Plaintiff was to stop the Elavil and reduce the Vicodin over a two week period to none. [Tr. 208].

3

On May 29, 2003, plaintiff returned for a follow up visit. The plaintiff noted that the headaches had returned, but without nausea. The pain was severe and lasted up to two days in duration. Physical exam was normal. Dr. Holt felt that plaintiff's headaches "should improve with physical therapy." He was placed back on Elavil to help with his sleep and given samples of Relpax. [Tr. 206-07].

The next visit was on July 10, 2003. Dr. Holt noted he was continuing on Elavil. He was also in physical therapy. The physical therapy was "gradually improving his chronic discomfort in the neck area." The headaches were less frequent, which plaintiff attributed to the physical therapy. After his PT treatments he would get about two days of relief before his next PT session. Dr. Holt ordered another month of PT. His Elavil was increased, and the Relpax was continued. [Tr. 205].

The next visit was on October 29, 2003. His Botox therapy seemed to have "worn off." The headaches had returned on a daily basis and it was noted the plaintiff had to quit his job because of the neck pain. He had pain on the left side of his neck and reported his head tilted involuntarily to the right. The impression was refractory daily migraine associated with cervical muscle spasm. Dr. Holt noted Botox was the best treatment but that the plaintiff "simply cannot afford the medication." Dr. Holt prescribed a trial of Zanaflex and continued the Relpax and Elavil. [Tr. 202-04].

Dr. Holt was sent an evaluation form from the Florida state agency, curiously about his mental condition. Dr. Holt returned the form saying "I have only seen this patinet for EMG/nerve conduction studies. I haven't evaluated the patient in consultation." [Tr. 200].

On May 5, 2004, plaintiff saw Dr. Holt for apparently the last time. Zanaflex

4

"reduced but did not eliminate his pain." He still had severe headaches one to two times per week, but they were "successfully aborted with Relpax." Zanaflex was discontinued while his other medications remained in place. [Tr. 199].

Plaintiff was also seen by Dr. Adelardo Acosta and Dr. Louis Valente of the Southwest Florida Pain Center. On March 18, 2002, Dr. Acosta performed a pulsed radio-frequency procedure on the plaintiff. [Tr. 181]. At a followup with the nurse on March 21, 2002, plaintiff described a "50% pain relief" as a result of the procedure. [Tr. 180]. At a visit on May 10, 2002, plaintiff reported that Vicodin was working well and the radio-frequency procedure had "helped a lot." [Tr. 178]. On June 12, 2002, plaintiff stated that his headaches continued on a daily basis. [Tr. 177]. On July 17, 2002, plaintiff told the doctor that Vicodin was "giving good pain management." [Tr. 176]. On July 17th, 2002, plaintiff was given an occipital nerve block by Dr. Valente. [Doc. 175]. On August 14, 2002, plaintiff reported to Dr. Valente that he had good pain relief for two weeks following the procedure, and still had less severe pain than before at that point. [Tr. 174]. However, on September 16, 2002, he told Dr. Acosta that his pain had been worse in the last month, and that he would like "to go back to the Vicodin." [Tr. 173]. He stated on October 15, 2002, that the Vicodin was "not as effective for pain management as he'd like." [Tr. 172]. On October 14th, the day before, he told Dr. Acosta that the pain he had prior to the radio-frequency procedure was still under control and had not returned "completely." [Tr. 171]. On December 12, 2002, Dr. Valente stated that the plaintiff's pain medication was "helping with [plaintiff's] quality of life." In his final recorded visit on February 12, 2003, plaintiff rated his pain as "8" on a scale of "1 to 10". [Tr. 169].

Two non-examining state agency physicians have also evaluated the plaintiff's medical records. On March 13, 2004, Dr. Moore opined that the plaintiff could perform a slightly reduced range of light work. [Tr. 218-25]. On September 7, 2004, Dr. Kambam also opined plaintiff could perform a slightly reduced range of light work. [Tr. 226-33].

None of the plaintiff's treating physicians completed any sort of functional capacity assessment. Likewise however, none offered an opinion in their written records that the plaintiff could not work.

Plaintiff was given a mental evaluation by Dr. Kenneth A Visser, a clinical psychologist, on April 7, 2004. Dr. Visser stated the plaintiff had an adjustment disorder with some depression. He opined the plaintiff would have a GAF of 75. [Tr. 198].

Dr. Jerrold R. Wentland, a clinical psychologist and licenced nurse-practitioner, opined that the plaintiff had a major depressive disorder, recurrent, moderate without psychotic features. Dr. Wentland opined that the plaintiff had a GAF of 50. [Tr. 268].

At the administrative hearing, the ALJ called Joyce Courtwright, a vocational expert, to offer opinions regarding what work the plaintiff could perform. He asked her to assume a person with the plaintiff's educational background and work experience who retained a residual functional capacity for a limited range of light work. He asked her to assume that the person could occasionally climb, balance, stoop, crouch, kneel and crawl. The person could sit for 30 minutes at a time and stand for 30 minutes at a time, but must be able to change positions every 30 minutes. The person would have certain non-exertional limitations such as avoiding excessive noise, etc. Mentally the person would have only very slight or mild limitations, with a GAF of 75. Reading would be limited to 30 to 40 minutes. With

6

those limitations, Ms. Courtwright opined that plaintiff could not return to any of his past relevant occupations. Such a person could, however perform certain jobs. The jobs identified by Ms. Courtwright were poly-packager, with 1,000 in the local economy and 69,000 in the national economy; cashier II with 2,500 locally and more than 250,000 in the national economy; and telephone survey worker with 1,000 locally and 89,000 nationally. If the plaintiff had a GAF of 50, then about half of the cashier II jobs would be gone, but all the others would remain. [Tr. 314-19].

The ALJ found that the plaintiff's "subjective complaints are not consistent with the objective medical evidence, and other evidence." Plaintiff had not shown "that the objectively determined medical condition(s) is of such a severity that it can be reasonably expected to give rise to his alleged pain." He also found that the plaintiff "is not fully credible." [Tr. 26]. The ALJ found that the plaintiff suffered from severe impairments, which he identified as migraine headaches, affective disorder, cervical muscle spasms, and cervical spine spondylosis. He went on to find that, even with these impairments, the plaintiff "can perform a limited range of light work activities" and that he would have the same limitations set forth in the aforementioned question asked of the vocational expert. Based upon her testimony, the ALJ found that the plaintiff could perform the jobs she identified and that he was not disabled. [Tr. 29-30]. Plaintiff asserts this finding was not supported by substantial evidence.

Plaintiff avers that the hypothetical question posed to the vocational expert did not include the effect of the plaintiff's frequent headaches on his ability to work. It is first noted that the plaintiff's Florida counsel did not ask the vocational expert to consider the headaches

7

either. Apparently, the Florida counsel also did not attempt to obtain opinions or assessments from the treating physicians regarding the affect of the plaintiff's headaches on his functional capacity. A Social Security plaintiff bears the burden of showing the severity of his impairments. Dr. Holt's treatment notes, as well as those of the pain clinic, show improvement in the plaintiff's pain with various treatment regimens. They do not indicate that any of plaintiff's conditions incapacitated him.

Plaintiff also insists that the ALJ erred in not finding his subjective complaints fully credible. Once again, the objective medical evidence in the record showed that plaintiff's pain and headaches improved with proper treatment. The ALJ is the finder of fact, with the duty to carefully consider the evidence. He did consider the testimony of the treating physicians and gave them considerable weight. He found from that evidence that the plaintiff was not credible in describing the severity of his impairments. Once again, none of his treating physicians provided any assessment of the plaintiff's residual functional capacity. Such an assessment would easily have trumped the opinions of the non-examining state agency physicians, but where there is no treating source who disagrees, the state agency physicians can provide substantial evidence for the ALJ's opinion.

Plaintiff asserts that the ALJ did not consider the fact that the plaintiff was 50 years of age, and that under Rule 201.10 of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Apendix 2, a person who can perform the full range of unskilled sedentary work at that age is nonetheless presumed disabled. The ALJ recognized plaintiff's age in his decision [Tr. 28], and found he could perform a reduced range of light work, not sedentary work.

8

Plaintiff also argues that the vocational expert's opinion regarding the jobs plaintiff can perform was wanting because it was not clear that the jobs identified would allow the plaintiff to have a sit-stand option, and that Social Security Ruling 83-12 recognizes that unskilled jobs are particularly structured so that a person cannot ordinarily sit or stand at will. However, SSR 83-12 also states that a vocational expert should be consulted to clarify the implications of available jobs in regard to the sit/stand requirements. This is precisely what the ALJ did, and the Court sees no reason why his reliance on the skill of the vocational expert was not justified in this case.

The Commissioner also notes that in his written statement that accompanied the plaintiff's disability report, he stated that he was collecting unemployment compensation after his alleged disability onset date. [Tr. 64]. One cannot tell the state that they are available to work while claiming a disabling impairment. In any event, and quite apart from this, there was substantial evidence to support the ALJ. It is possible that plaintiff's treating physicians could have made a stronger case if they had discussed the effects of his impairments on his ability to do work-related activities. Then again, perhaps they did not themselves believe the impairments to affect that ability in a significant way. The ALJ acted within his lawful parameters to hold as he did.

There was substantial evidence to support the question asked of the vocational expert. Likewise, there was substantial evidence to support the ultimate findings of the ALJ. He considered all of the evidence and gave such weight to plaintiff's substantive complaints as he, as the finder of fact, felt they deserved in light of the objective medical evidence. It is therefore respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings

[Doc. 11] be DENIED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 15] be GRANTED.[1]

Respectfully submitted:

  s/ Dennis H. Inman  
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947-950 (6th Cir. 198l); 28 U.S.C. § 636(b)(1)(B) and (C).